IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| | | |
|---|---|---|
| NETWORKS USA X, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | No. 3:06-CV-63 |
| | ) | |
| NATIONWIDE MUTUAL | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This civil action is before the court for consideration of "Plaintiff's Motion for
Summary Judgment"[doc. 81] and "Defendant's Motion for Summary Judgment" [doc. 91].
The parties have filed responses to the motions [docs. 92, 95], and each party has also
submitted a reply [docs. 96, 95].  Oral argument is not necessary, and the motions are ripe
for the court's determination.  For the reasons that follow, plaintiff's motion will be denied,
defendant's motion will be granted, and the case will be dismissed.

I.

*Background*

In  August  1991,  defendant,  Nationwide  Mutual  Insurance  Company
("Nationwide"), entered into a lease with the predecessor in interest to plaintiff, Networks
USA X, Inc. ("Networks").  The lease agreement was for the rental of an office building "of

approximately 6,000 square [feet] . . ., which includes an approximately 900 square foot drive-thru claims inspection area to be constructed by Landlord." The property is located in Knox County, Tennessee. Networks purchased the property in March 1993 and assumed the lease. Nationwide continued to be the tenant on the premises until March 2007. Networks filed its original complaint in Knox County Chancery Court on December 29, 2005, and Nationwide removed the case to this court on February 16, 2006. On October 24,2006, Networks filed an amended complaint [doc. 36].

The case was referred to a special master by an agreed order to answer the following question: "Whether, under the commercial lease agreement between the parties, Nationwide has underpaid or overpaid rent and/or common-area maintenance charges to Networks?" The special master concluded that he could assist the parties in determining certain amounts at issue between the parties but could not decide what if any amounts are due Networks because the disputes are primarily legal in nature. The special master, with the assistance of the parties, determined the following amounts to be appropriate for specific items identified as "operating expenses":

| | |
|---|---:|
| roof repairs | $ 14,370 |
| management fees | 18,096 |
| accounting fees | 5,000 |
| security guard services | 18,527 |
| real estate tax credit | (873) |
| | |
| Total operating expenses | $ 55,120 |

The special master also concluded that Nationwide was entitled to a credit for overpayment of insurance.  The case is now before the court on the parties' cross motions for summary judgment.

## II.

*Summary Judgment Standard*

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party may discharge its burden by  demonstrating  that the non-moving party has failed to establish an essential element of that party's case for which he or she bears the ultimate burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party need not support its motion with affidavits or other materials negating the opponent's claim. *Id.* at 323. Although the moving party has the initial burden, that burden may be discharged by  a "showing" to the district court that there is an absence of evidence in support of the non-moving party's case. *Id.* at 325 (emphasis in original).

After the moving party has carried  its initial burden of showing that there are no genuine issues of material fact in dispute, the burden shifts to the non-moving party to present specific facts demonstrating that there is a genuine issue for trial. *Matsushita Elec.*

*Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582 (6th Cir. 1992) (citing *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)).

In order to defeat the motion for summary judgment, the non-moving party must present probative evidence that supports its complaint. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). The non-moving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor. *Id.* at 255. The court determines whether the evidence requires submission to a jury or whether one party must prevail as a matter of law because the issue is so one-sided. *Id.* at 251-52.

## III.

### *Analysis*

### Nationwide's Motion for Summary Judgment

Nationwide has moved for summary judgment on all claims asserted in the amended complaint [doc. 36]. In its supporting memorandum, it has also combined its arguments in response to Networks's motion for summary judgment, which it states are essentially the same. Nationwide has structured its brief by addressing the categories of damages sought by Networks under the asserted claims and has numbered them one through ten. For clarity, the court will address each category in the order it appears in Nationwide's motion.

# 1. Roof Repairs

Networks contends it is owed $14,369.60 for replacement of roof shingles in 2005. Networks attempted to charge the roof replacement cost as an operating expense; however, Nationwide refused to pay it. Nationwide argues that under the terms of the lease it is not responsible for roof repairs or replacement. Networks contends that shingles and their replacement on the roof do not fall within the exclusionary language of "Operating Expenses" as set out in the lease.

Paragraph 4(B) of the lease states that the Tenant "agrees to pay to Landlord, as additional rent, the estimated costs and expenses to Landlord ("Operating Expenses")." Paragraph 4(C) of the lease states, "The term Operating Expenses does not include any capital improvement to the building or amounts expended by Landlord for repairs to structural elements of the building including the roof." Networks argues that the lease does not define "structural elements" and that the term "structural" as used in the lease does not refer to shingles but to the underlying framework of the roof including the trusses and sub-structure.

Nationwide argues that Networks's interpretation rewrites the lease agreement and results in a finding not intended by the original parties to the lease. Nationwide also contends that the plain language of the lease supports its position that there are two reasons why it is not responsible for the roof replacement: the roof is a capital improvement and it involves a structural element of the building.

The court agrees with Nationwide that it is not responsible for the roof replacement. Initially, the court finds that Networks's attempt to redefine "structural" and to make replacement of the shingles a separate expense from the roof replacement itself to be a distortion of the plain language of the lease. "It is the Court's duty to enforce contracts according to their plain terms. Further, the language used must be taken and understood in its plain, ordinary and popular sense. The courts, of course, are precluded from creating a new contract for the parties." *Alcazar v. Hayes*, 982 S.W.2d 845, 848 (Tenn. 1998) (internal citations omitted) (quoting *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975)). "If the language of the contract is clear and unambiguous, then its literal meaning should control the outcome of the dispute." *McPherson v. William E. George, Inc.*, No. W2008–02450-COA-R3-CV, 2010 WL 1565528, at *8 (Tenn. Ct. App. April 20, 2010).

The language of the lease plainly states that Operating Expenses do not include "repairs to structural elements of the building *including the roof*." The shingles are part of the roof, and there is no need to engage in the type of strained interpretation and argument promoted by Networks. Nationwide is not responsible for the roof replacement based upon the "structural elements" language in the lease. Any other interpretation would be rewriting the lease and creating a new contract, which the court is not permitted to do. *See Alcazar*, 982 S.W.2d at 848.

The court also agrees with Nationwide that it is not responsible for the roof replacement because the roof is a capital improvement. The lease also states that Operating Expenses do not include "any capital improvement to the building." Nationwide argues that courts from a variety of jurisdictions have considered roofs to be capital improvements. Networks attempts to distinguish these cases by saying that they were not on point or that the tenant was responsible for the repair or replacement of the roof. The fact remains, however, that the purpose of the authority is to show that a roof is a capital expense or improvement, not that the particular facts of a given case called for the tenant to be responsible for the repairs or replacement. This court notes that numerous courts have considered a roof to be a capital improvement. *In re Nahas*, 161 B.R. 927, 932 (W.D. Pa. 1993) (shopping center made capital improvements, including a roof); *Bettinger v. Bettinger*, 793 P.2d 389, 391 (Utah App. 1990) ("The court found only capital improvements made were a new gabled roof and screens."); *Braeshire Condo. Bd. of Managers v. Brinkmeyer*, 841 S.W.2d 217, 221 (Mo. App. 1992) ("replacement of roofs, a major capital improvement for the condominiums"); *Litvak v. 155 Harbor Drive Condo. Ass'n, Inc*., 614 N.E.2d 190, 193 (Ill. App. 1993) ("[Capital improvements] may also include roof and gutter replacement."); *Homar Enters., Inc. v. Daake*, 957 S.W.2d 353, 356 (Mo. App. 1997) ("Examples of such capital improvements are the structure itself, foundations, piers, roof, roofing..."); *Floyd v. Floyd*, 615 S.E.2d 465, 472(S.C. App. 2005) ("capital improvements such as a new roof"); *Four Seasons Mfg., Inc. v. 1001 Coliseum, LLC*, 870 N.E.2d 494, 509 n.9 (Ind. Ct. App. 2007)

(roof repairs "constituted a capital improvement").  Therefore, because the roof replacement was a capital improvement under the plain terms of the lease, Nationwide was not responsible for the cost.

The court does not need to tarry long on Networks's remaining contentions concerning Nationwide's alleged responsibility for the cost of the roof.  Networks claims that Nationwide was  somehow negligent in not reporting the condition of the roof.  The first element in a negligence claim is a duty of care owed by the defendant to the plaintiff.  *See Staples v. CBL & Assocs., Inc.*, 15 S.W.3d 83, 89 (Tenn. 2000).  Nationwide did not owe Networks a duty regarding the care and maintenance of the roof under the lease,  as is evident from the above-discussion regarding the language of the lease.  There is also no basis for Networks's claim that Nationwide has responsibility for the roof cost because it requested the repair.  First, there is no credible proof that Nationwide in fact made such a request.  Second, even if it did, nothing in the lease requires Nationwide to pay for any such requested repair.  The language of the lease makes Networks responsible for the cost of the new roof.

### 2. Errors in Previously Invoiced Management Fees

Networks claims that the monthly management fees that it charged Nationwide for the years 2003, 2004, and 2005 were "simply an error," and it seeks to recover the additional amounts that should have been charged for those years.  Networks billed Nationwide management fees of $500 per month in 2003 and 2004 and $567 per month in

2005 when the actual fees according to Jerome Feldman should have been $833 per month if properly charged. There is no question that Nationwide paid all of the management fees for which it was billed. Nationwide argues that it is not responsible for Networks's errors in the invoiced fees and Networks has waived its right to collect the extra amounts. The court agrees with Nationwide.

Networks created the invoices that Nationwide paid. Networks accepted Nationwide's payments. Nationwide is not responsible for Networks's alleged billing mistakes that were made several years ago. In any event, Networks has now waived the right to collect monthly fees for the years 2003, 2004, and 2005.

Under Tennessee law, "[w]aiver is commonly defined as the voluntary relinquishment of a known right[,] established by express declarations or acts manifesting an intent not to claim the right." *94th Aero Squadron of Memphis, Inc. v. Memphis-Shelby County Airport Auth*., 169 S.W.3d 627, 635 (Tenn. Ct. App. 2004) (internal quotation marks and citations omitted).

> Waiver may be proved by express declaration; or by acts and declarations manifesting an intent and purpose not to claim the supposed advantage; or by a course of acts and conduct, or by so neglecting and failing to act, as to induce a belief that it was [the party's] intention and purpose to waive. In order to establish waiver by conduct, the proof must show some absolute action or inaction inconsistent with the claim or right waived.

*Ky. Nat'l Ins. Co. v. Gardner*, 6 S.W.3d 493, 499 (Tenn. Ct. App. 1999) (internal quotation marks and citations omitted).

Networks accepted Nationwide's monthly payments for management fees in the amounts stated above for the years 2003, 2004, and 2005, which is reflected on the common area maintenance ("CAM") reconciliations prepared by Networks. Nationwide relied on the acceptance of its payments for those fees and the CAM's provided by Networks. Networks made no effort during a several year period to collect the additional amounts of management fees it now seeks to collect. Networks failed to act and has waived its right to any additional management fees for the years 2003, 2004, and 2005.

### 3. Real Estate Taxes, Base Rent, Insurance

This issue was resolved by the special master. He determined that Nationwide is entitled to a credit for real estate taxes and for overpayment of insurance. No base rent is owed.

### 4. Accounting Fees as Operating Expenses

Networks contends that Nationwide owes $5,000 in accounting fees as an operating expense for the years 2005 and 2006.[1] Networks argues that such fees fall within the broad definition of operating expenses under the lease and are related to the services and operation of the building. Nationwide argues that such fees are not listed as an operating expense under the lease and should be included in the management fee Networks charges.

---

[1] There is no indication in the record that Networks specifically charged this fee throughout the duration of the lease term.

It points out that the operating expenses and costs identified and the examples listed in the lease are related to the building and its operation and maintenance. Nationwide further contends that accounting services do not have anything to do with the operation of a single-tenant building.

Paragraph 4(B) of the lease states, "Tenant hereby agrees to pay to Landlord, as additional rent **,** the estimated costs and expenses to Landlord ("Operating Expenses") of *providing the required maintenance and repair of the building in accordance with accepted principles of sound operation* and management." (emphasis added).

Paragraph 4(C) of the lease describes in part operating expenses:

> The term "Operating Expenses" as used above includes all expenses incurred with respect to the maintenance and operation of the building including, but not limited to, maintenance and repair costs, electricity, fuel, water, sewer, gas and all other utility charges, security, window washing, janitorial services, trash and snow removal, landscaping and pest control, management fees, wages and fringe benefits payable to employees of Landlord whose duties are connected with the operation and maintenance of the building and/or project, amounts paid to contractors or subcontractors for work or services performed in connection with the operation and maintenance of the building (including its mechanical and electrical components), all services, supplies, repairs, replacements or other expenses for maintaining, operating and repairing the building including common area and parking area maintenance.

The court agrees with Nationwide's contention that accounting fees are not the type of expenses that are included as examples in the lease. The doctrine of *ejusdem generis* is based on the maxim that "where general words are used, followed by a designation of

particular things or subject to be included or excluded as the case may be, the inclusion or exclusion will be presumed to be restricted to the particular thing or subject." *Costa v. Clayton*, No. E2000-02627-COA-R3-CV, 2001 WL 703880, at *2 (Tenn. Ct. App. June 22, 2001) (quoting *Shipley v. SOFCO Erectors, Inc*., Nos. C.A. 743 and 790, 1988 WL 48618, at *6 (Tenn. Ct. App. May 16, 1988)); *see also Central Drug Store v. Adams*, 201 S.W.2d 682, 685 (Tenn. 1947) ("In 35 C.J., Landlord & Tenant, sec. 478, p. 1181, it is said: 'The meaning of general words in a lease is restricted by more specific and particular descriptions of the subject matter to which they apply. Thus, where no intention to the contrary appears, general words used after specific terms are to be confined to things ejusdem generis with the things previously specified.'"). The rule is commonly applied to statutes and wills but is equally applied to other written instruments. *Costa*, 2001 WL 703880 at *2.

The types of expenses enumerated in the lease such as window washing, janitorial services, trash and snow removal, and pest control are matters related to maintenance of the building. Accounting fees are not associated with the maintenance or repair of the building. Such fees are more associated and included with the maintenance fees charged by Networks, and management fees are included as an operating expense. In the court's opinion, the language of the lease does not support a separate charge for accounting fees as an operating expense, and the claim based on those fees will be denied.

## 5. Security Guard Services as Operating Expenses

Networks contends it is entitled to the amount it paid for security guard services for the subject premises. It claims Nationwide owes the amount as an operating expense. Nationwide contends that the charges are not a legitimate operating expense and it should not be responsible for them.

In 2003 Networks on its own hired a security guard to police the parking lot area of the Nationwide premises. Customers of a restaurant adjacent to the premises used Nationwide's parking lot after business hours. In a letter dated October 14, 2003, Judith Coleman, as a representative of Nationwide Corporate Real Estate,[2] requested that the services of the security guard be discontinued. In a letter dated October 14, 2003, Michael Feldman wrote on behalf of Networks to Judith Coleman confirming receipt of her letter and stating that they would "acquiesce to your request to remove the security personnel and allow the after hours parking on the premises." Networks on its own initiated the services again in 2005 and incurred over $18,000 in security fees in 2006.

Networks argues that the definition of operating expenses in the lease allows it to charge for "security" services. It also argues that under the lease the premises were to be used only for general office purposes and that "Tenant will not permit the Premises to be used for any purpose or in any manner (including without limitation any method of storage)

---

[2] Although plaintiff did not provide the signature page for this letter, Networks did provide its letter confirming receipt of the letter, which is addressed to Judith Coleman, Lease Administrative Manager, Nationwide Corporate Real Estate.

. . . ." Nationwide points out that it never allowed the restaurant patrons to use the parking lot, as the overflow parking occurred after Nationwide's business hours. It was not an activity that Nationwide permitted. Nationwide also points out that there is no proof in the record that the parking by the restaurant patrons voided the insurance policy for the premises. Nationwide carried the liability policy and would have been responsible for any claim as a result of the parking.

The court agrees with Nationwide that it is not responsible for security guard charges because the overflow parking occurred after hours and was not connected to the operation or management of the building as it related to Nationwide's tenancy pursuant to section four of the lease. Networks, after agreeing to withdraw the security services, on its own resumed use of the security guard in 2005 and into 2006. It chose to do that and benefitted privately from that decision. Nationwide should not have to pay for these security services that were not necessary to the maintenance, operation or repair of the premises. Therefore, this claim fails.

### 6. Interest on Operating Expenses

As discussed herein, Networks is not entitled to any amount in operating expenses. Thus, no award of interest is necessary.

## 7. Damages for Alterations to Premises

When Networks purchased the subject property in 1993, a portion of the building was used as a claims garage, with two exterior garage doors. After Networks acquired ownership of the property, this garage area was converted to interior office space.[3] According to the affidavit of Judith Coleman, the alterations of the claims garage were finalized some time prior to December 31, 1994. This time frame is not disputed.

Networks claims that Nationwide altered the premises without its permission and is seeking an $80,000 allowance paid to its new tenant, a bank, to restore the enclosed area to a drive-thru. Networks bases its claim on paragraph 5 of the lease, which addresses alterations to the premises.

> Tenant shall not make any alterations, additions or improvements to the Premises (including but not limited to roof and wall penetrations) without the prior written consent of Landlord, not to be unreasonably withheld.

Neither side has presented any proof that permission was sought or given for the conversion of the claims garage to interior office space.

Nationwide argues that the lease does not require that the premises be restored to their original condition and that the statute of limitations bars the claim. The court agrees with Nationwide. The terms of the lease do not require that Nationwide restore the premises to their original condition. Paragraph 5 addresses alterations and improvements and states:

---

[3] There is no documentation in the record to show who exactly contracted for the conversion of this space.

15

> All shelves, bins, machinery and trade fixtures installed by
> Tenant may be removed by Tenant prior to the termination of
> this Lease if Tenant so elects, and shall be removed by the
> Termination Date of this Lease or upon earlier vacating of the
> Premises if required by Landlord; upon any such removal
> Tenant shall restore the Premises to their original condition.

The requirement that the premises be returned to their original conditional obviously applies only to the removal of shelves, bins, machinery, etc. and not to major improvements such as the enclosed office space at issue here. Thus, even if Nationwide altered the premises without Networks's permission sixteen years ago, the lease does not compel Nationwide to restore the premises to their original condition.

In addition, and most significantly, the statute of limitations has run on this claim for alleged breach of the lease. Tennessee law requires that actions involving contracts and "the use and occupation of land" be filed within six years after the cause of action accrued. Tenn. Code Ann. § 28-3-109(1),(3). The proof in the record is that the alterations to the claims garage area were completed before December 31, 1994. Therefore, any cause of action based on those alterations and their relationship to the lease had to be filed no later than December 31, 2000. Networks did not file its original complaint until December 29, 2005. [4] The claim is time barred.

---

[4] The claim for the alteration to the premises was not included in the original complaint.

Networks argues that the discovery rule applies and that there is at least a question of fact when the statute of limitations begins to accrue. The court disagrees. Networks is correct that the discovery rules has been applied in contract cases. *Goot v. Metro. Gov't of Nashville & Davidson County*, No. M2003-02013-COA-R3-CV, 2005 WL 3031638 (Tenn. Ct. App. Nov. 9, 2005). However, "the discovery rule applies in cases where the breach of contract is inherently undiscoverable." *Id.* at *11. "The inherently undiscoverable requirement is met when the injured party is unlikely to discover the wrong during the limitations period despite due diligence." *Capital TCP, LLC v. New Horizon Memphis, LLC*, No. 2:07-cv-02157-JPM-dkv, 2010 WL 2734148, at *5 (W.D. Tenn. July 9, 2010) (quoting *Goot*, 2005 WL 3031638, at *11 n.31).

There is nothing "inherently undiscoverable" about the alterations that were made to the claims garage. Prior to the conversion, the exterior of the area had two garage doors. After the conversion, the garage became interior office space. A cursory inspection of the exterior of the building would have revealed to Networks these changes. The fact that Networks is located in Florida is not an excuse for its failure to exercise due diligence in the management of the building. The lease allows the Landlord and the Landlord's agents and representatives to reasonably inspect the interior of the premises. If Networks chose not to exercise its inspection rights, that is not Nationwide's fault. Again, the changes to the premises were open and obvious. Networks did not need an agent or representative to inspect the interior of the premises in order to have knowledge of the conversion. Simply

viewing the exterior of the building would have given notice of the changes that were made to the claims garage. The court thus concludes that the discovery rule does not apply in this case. Therefore, the six-year statute of limitations bars this claim.

Nationwide also argues that the claim is barred by the doctrine of laches. Because a specific statute of limitations applies in this case, the doctrine of laches does not really apply. *Gallimore v. Gallimore*, No. W2008-00856-COA-R3-CV, 2009 WL 856991, at *7 (Tenn. Ct. App. April 2, 2009) ("Generally, the doctrine of laches applies to actions not governed by a statute of limitations."); *see also Brinton v. Brinton*, No. M2009-02215-COA-R3-CV, 2010 WL 2025473, at *5 (Tenn. Ct. App. May 19, 2010) ("[T]he doctrine [of laches] is usually applied where no statute of limitations governs the case." (citation omitted)).

In addition, Nationwide argues that the doctrine of implied consent bars the claim. The court finds that the record is insufficient to address this argument. The court also finds that it does not need to reach Nationwide's arguments that the property was more valuable as enclosed office space and that the claim fails because Networks suffered no damages from the conversion of the premises.

### 8. Replacement of HVAC Units

Networks contends it is entitled to recover from Nationwide a $12,000 allowance for new heating and air conditioning units.[5] Networks argues that the heating,

---

[5] Networks's motion for summary judgment indicates that the original estimate to replace the
(continued...)

ventilating, and air conditioning ("HVAC") units had to be replaced after Nationwide left and that Nationwide is responsible under the lease for the cost of the new units as an operating expense. Nationwide states that during the term of the lease it maintained the service contracts on the HVAC system at its expense and did replace three of the five HVAC units located on the roof of the building. Attached to its response to the motion for summary judgment is the affidavit of Judith P. Coleman, retired Director, CRE Lease Administration, Corporate Real Estate, with Nationwide who is currently working part time with the Corporate Real Estate Lease Team of Nationwide. Attached to her affidavit are records showing that the HVAC units were inspected, serviced, and in good working order as of the end of February 2007, a month prior to the end of the lease term.[6] It is Nationwide's position that the lease did not require it to install new HVAC units upon termination of its tenancy. The court agrees.

---

[5](...continued)
units was $34,824. However, after entering into a new lease agreement with a new tenant, it only had to pay an allowance of $12,000.

[6] Networks states in passing that these documents are hearsay and should be stricken. However, these documents have been authenticated by Coleman's affidavit in accordance with Fed. R. Civ. P. 56, and Networks has not challenged Coleman's ability to authenticate and introduce them. 10A Charles A. Wright, Arthur R. Miller and Mary Kay Kane, *Federal Practice & Procedure* § 2722, at 379-80 & 382-84 (1998) ("Rule 56(e) requires that sworn or certified copies of all papers referred to in an affidavit must be attached to or served with that affidavit. . . . To be admissible, documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence.").

Paragraph 22(F) of the lease provides:

> Upon the expiration or earlier termination of the term hereof, and prior to Tenant vacating the Premises, Tenant shall pay to Landlord any amount reasonably estimated by Landlord as necessary to put the Premises, including without limitation all heating and air conditioning systems and equipment therein, in good condition and repair, *reasonable wear and tear . . . excepted*." (emphasis added).

The plain language of the lease required Nationwide to leave the HVAC units in good repair. The limiting language "reasonable wear and tear . . . excepted" takes into consideration the age and use of the units and means that Nationwide did not have to provide brand new HVAC units upon leaving. The documentary evidence provided by Nationwide demonstrates that just one month prior to the end of the lease term the two HVAC units were in good repair and operational, and Networks has provided nothing to challenge that showing.

The fact that Nationwide replaced HVAC units during the term of the lease is not relevant to whether it is required upon vacating the premises to provide new units. If new units were needed during the lease term, Nationwide met that obligation. However, at the expiration of the lease, Nationwide was only obligated under the terms of the lease to leave the HVAC units in good condition and repair, which it did. Therefore, Networks's claim for the allowance toward new HVAC units fails.

### 9. Back Rent Based on Revised Square Footage Calculation

Networks claims it is due "back rent" for an additional 149 square feet of property for the duration of the lease. According to Networks, it discovered in 2005 that the building consists of 6,149 square feet not 6,000 square, and it now wants to collect rent on the additional 149 square feet.

Paragraph one of the lease states that the premises consists of "approximately a 6,000 square foot office building." The estoppel letter dated March 23, 1993, in which Nationwide ratified the lease and certified the premises, states, "to the best of Tenant's knowledge, . . . the Floor Area of the Leased Premises is 6,000 square feet." This letter was provided to Networks by Nationwide when Networks purchased the property in 1993.

This "back rent" claim fails for more than one reason. First and foremost is the fact that there is no proof in the record to verify the actual square footage of the building. Other than hearsay, Networks has presented no proof whatsoever that the premises are in fact 6,149 square feet. Jerome Feldman's statement in his affidavit that "in September of 2005, Networks obtained an accurate measurement of the square footage of this building and learned that the exact square footage was 6,149 square feet" is hearsay and does not establish the actual square footage of the building. The record contains no authenticated and accurate measurement, floor plan or documentary evidence of any kind that establishes that the building is 6,149 square feet. Mr. Feldman's hearsay statement is insufficient and proves nothing. "[H]earsay evidence may not be considered on a motion for summary judgment."

*Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996) (citing *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994)).

A second basis for denying this claim is Networks's failure to cite any provision in the lease that permits it to collect rent retroactively for the entire term of the lease or to modify the square footage stated in the lease retroactively to the time of acquisition in 1993. It merely argues that it discovered in 2005 that the actual square footage of the building is 6,149 and it wants to collect back rent for the additional 149 square feet. Without language in the lease permitting such modifications and action by the landlord, this claim fails.

In addition, when Networks purchased the property in 1993, it did not have to rely on the square footage in the lease or the estoppel letter. As owner with a right of inspection, Networks could have had the building measured at the time of purchase or any time thereafter. If a documented difference in square footage was discovered, it could have renegotiated the lease at an appropriate time under the terms of the lease. Instead, Networks sought fourteen years of "back rent" based on a hearsay statement and did so without authority under the provisions of the lease. Such a claim cannot prevail. In addition, the court agrees with Nationwide's argument that any claim for such "back rent" for the years 1993-1996 is barred by the statute of limitations. Tenn. Code Ann. § 28-3-109(a)(1).

**10. Attorney's Fees**

Networks is not a prevailing party in this civil action. Accordingly, attorney's fees will not be awarded to it.

The court has found that Networks is not entitled to recover on any of its alleged claims for breach of the lease agreement or its negligence claim related to the roof replacement. Since Nationwide is entitled to summary judgment, the court need not address Networks's motion for summary judgment, and it, therefore, will be denied.

IV.

*Conclusion*

Accordingly, for all the reasons discussed above, Networks's motion for summary judgment will be denied. Nationwide's motion for summary judgment will be granted, and this case will be dismissed. An order consistent with this opinion will be entered.

ENTER:

_____s/ Leon Jordan_____
United States District Judge

23